IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| Ann Marie Attridge | § |
| | § |
| *Plaintiff* | § Civil Action No.: |
| | § |
| | §   5:20-cv-00205-OLG |
| | § |
| V | § |
| | § |
| | § |
| | § |
| Colonial Savings, F.A. and Trans | § |
| | § |
| Union, LLC | § |
| | § |
| *Defendants* | § |
| | § |

Plaintiff's Response to Motion for Summary Judgment by

Defendant Colonial Savings, F.A.

_____

Credit reports are largely composed of the information provided by furnishers. When a furnisher verifies information it knows to be false, liability is triggered under the Fair Credit Reporting Act. When a consumer finds false information, they can dispute it. Following each of Attridge's disputes Colonial certified that it had verified information it knew to be false. Will this Court allow Colonial to escape liability after repeatedly certifying that it had verified false information?

Factual Background[1]

    1. In 2014 Ann Attridge tried to make an online mortgage payment to Colonial and was blocked. When she contacted Colonial she was told it was due to a bankruptcy flag in her file. She informed Colonial that she had never filed bankruptcy. Colonial said they would fix it. She believed the flag had been removed because the following day she was able to make payment. Colonial admits as this much—in its motion it produced an internal email showing its knowledge of the falsity as early as 2014[2]:

> Diane,
>
> Please take this out of bankruptcy right away. It was a false positive. A business in Arkansas had the same last 4 digits of the EIN as the mortgager had for her SSN. The mortgager will be calling back in about 20 minutes to see if this has been done so she can make a payment.
> Thanks!
>
> Melissa,
>
> Please look at her credit reporting and make sure there are no comments regarding bankruptcy on it since she has never filed. Please fix it if you need to and send a letter to the mortgager.
> Thanks!
>
> *Cynthia (CJ) Conte*
> Colonial Savings F.A.
> 2626-B West Freeway
> Fort Worth, Texas 76102
> **(817) 810-4624**

    2. The chain of emails following this email shows Colonial understood the impact of false bankruptcy reporting. At this time Attridge was not aware of whether Colonial had reported this information on her credit report.

---

[1] Exhibit 1 is Attridge's declaration which give more detail as to the factual background.
[2] Exhibit 2 contains the 2014 email chain.

3. Five years later, in 2019, Attridge, while seeking employment in the mortgage industry, was offered a job contingent on the results of a background check. When a HireRight background check came back she was flabbergasted. She saw that Colonial was now furnishing inaccurate information—reporting that her account was included in a bankruptcy. Information Colonial knew was false.

4. The same day Attridge contacted Colonial through its web portal to notify them of the error. Five days later, without a response, Attridge called Colonial and filed a dispute with HireRight. A week later Colonial responded acknowledging the bankruptcy reporting was false and showering blame on TransUnion. [3]

## Background on Credit Reporting

5. Credit reports are largely composed of the information provided by furnishers. Furnishers send data to the credit bureaus via a set of codes known as the Metro 2 format. The Metro 2 format is a long string of letters and numbers. Each combination of letters and/or numbers contains specific information reflected as information on a consumer's credit report. See Chapter 3 of Defendant's Exhibit A-9.

6. This long string is broken into a number of sections or "fields" each with its own meaning. The Consumer Information Indicator (CII) field is where a furnisher can

---

[3] Exhibit 3: Colonial's May 1, 2019 letter to Attridge acknowledging the false reporting.

report an account as having been included in a bankruptcy. Or erase an erroneously reported bankruptcy.

7. Colonial attached 2017 Credit Reporting Resource Guide (2017 CRRG) as Exhibit A-9 to its motion[4]. The 2017 CRRG states on page 1-1:

> Both credit grantors and consumers depend on consumer reporting agencies to acquire and maintain accurate credit histories. This can only be accomplished if the provider of consumer data understands the tools that are available and adheres to the standards for credit reporting.

8. While the 2017 CRRG instructs otherwise, Colonial's credit reporting specialist Deanzala "Dee" Johnson testified that per her training leaving the CII field blank would correct the bankruptcy reporting:

```
Q. Do you -- does the blank -- what effect does the
blank line have in updating or changing the credit
reporting?
A. It takes away any previously reported.
Q. It takes any previously reported what?
A. Reported code.
Q. Okay. So where did you learn that that takes away
the previously reported codes?
A. When I was trained, and also from the manuals.
Deposition of Dee Johnson Page 22:12-20. Exhibit 5.
```

9. But the 2017 CRRG manual makes it clear leaving the CII field blank does not take

---
[4] Exhibit 4. Plaintiff attaches Chapter 1 of the 2017 CRRG.

away the previously reported code. Per the 2017 CRRG page 4-22 (pictured in part below) "**Regardless of the method of reporting, the indicator will be deleted *only* when another Consumer Information Indicator or Removal value (Q, S, U) is reported.**" (emphasis in original):[5]

| FIELD | FIELD NAME & DESCRIPTION | 426 Character Format | | |
| --- | --- | --- | --- | --- |
| | | Length | Position | Recording Technique |
| 38 | **Consumer Information Indicator** <br> Contains a value that indicates a special condition of the account that applies to the primary consumer. <br><br> This special condition may be that a bankruptcy was filed, discharged, dismissed or withdrawn; a debt was reaffirmed; or the consumer cannot be located or is now located. <br><br> The indicator should be reported one time and will remain on file until another Consumer Information Indicator or a Removal value is reported.  As an option, the indicator may be reported each month as long as the condition applies. <br><br> **Regardless of the method of reporting, the indicator will be deleted *only* when another Consumer Information Indicator or a Removal value (Q, S, U) is reported.** <br><br> Exhibit 11 provides a list of Consumer Information Indicators and examples that demonstrate how to report these codes. <br><br> For reporting guidelines, refer to Frequently Asked Questions 23 through 32 (bankruptcy) and 61 (personal receivership). <br><br> **Note:  When converting from Metro™ to Metro 2®, it is necessary to report the applicable Consumer Information Indicator on your first Metro 2® submission, even if you had reported this information through an Account Status Code or Special Comment Code on your last Metro™ submission.** | 2 | 326-327 | AN |

10. Dee Johnson, Colonial's credit reporting specialist, had this manual at her desk.

```
Q. Okay. Which manuals did you receive from Colonial?
A. I received Colonial's manual, resource manual, and
```

---

[5] See Exhibit 6 This image is taken from Page 4-22 of the 2017 CRRG.

```
also received the CDIA manual from e-OSCAR.
Q. Okay. And when you say the "CDIA manual," do you
mean the Credit Reporting Resource Guide?
A. Yes.
Q. And do you keep those at -- well, I assume prior to
the pandemic, you worked at a desk at Colonial,
correct?
A. Yes.
Q. And did you keep those manuals at your desk at
Colonial?
A. Yes.
Deposition of Dee Johnson Page 7:6-19. Exhibit 5.
```

11. The Metro 2 format is a set of codes that are meant for machine, not human, interpretation. They are presented, for readability, on an ACDV form. Johnson reviewed these ACDV forms before submitting Colonial's data to TransUnion.

```
Q. Okay. So after you go through all the drop-downs and
fill in all the boxes, you print this out, and you
check it --
A. Yes.
Q. -- whenever you submit it?
A. Yes.
Q. And you check this document carefully?
A. Yes.
Deposition of Dee Johnson Page 19:2-9. Exhibit 5.
```

12. The CII field is presented on the ACDV form as a three box column among a rows

of boxes. Colonial's credit reporting specialist reviewed this document carefully and intended to report the CII information as blank. Colonial was under the mistaken understanding that leaving it blank would correct the inaccurate reporting. It failed to understand the tools for credit reporting and adhere to the standards for credit reporting. Instead it incorrectly blamed TransUnion for not accepting a blank field as a removal value.

### Attridge's First Dispute

13. Following receipt of Attridge's first dispute and per her training, Colonial's credit reporting specialist left the CII field blank. The end of the text on page two of the ACDV under "Submitted by:" the form states:

    "**By submitting this ACDV, you certify** that you have reviewed and considered all associated Images, **you have verified the accuracy of the data in compliance with all legal requirements**, and your computer and/or manual records will be adjusted to reflect any changes noted." (emphasis added).

14. Below is the relevant portion of Colonial's May 14, 2019 ACDV form with the CII field highlighted[6].

---

[6] Exhibit 7 is a true and correct copy of the May 14, 2019 ACDV form with redactions per Fed. R. Civ. P. 5.2.

| Account Type | Interest Type | Port. Type | Term Dur. | Freq. | Date of Account Information | Date Closed | Date of Last Payment | Sch. Payment | ECOA | CII | FCRA DOFD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 26 | | M | | | 03-31-2019 | 07-31-2015 | 03-31-2019 | | 1 | E | 07-31-2015 |
| 26 | F | M | 360 | M | 04-30-2019 | | 04-24-2019 | | 1 | | |
| Compliance | | | | | | | | | | | |

15. It does not contain a removal value as required on page 4-22. The negative, inaccurate reporting continued. So did the disputes.

Attridge's Second Dispute

16. Attridge again disputed the negative, inaccurate reporting. In a dispute response dated June 14, 2019 Colonial's credit reporting specialist responded without putting a removal value ("Q", "S", or "U") in the CII indicator[7]. Again by submitted the ACDV she certified that she had verified the accuracy of the bankruptcy in compliance with all legal requirements.

| Account Type | Interest Type | Port. Type | Term Dur. | Freq. | Date of Account Information | Date Closed | Date of Last Payment | Sch. Payment | ECOA | CII | FCRA DOFD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 26 | | M | | | 07-31-2015 | 07-31-2015 | | | 1 | E | 07-31-2015 |

17. The bankruptcy reporting did not change. The June 2019 dispute results from TransUnion (attached as Exhibit E[8] to the amended complaint [Docket No. 13-7]) continue to reflect Colonial's reporting:

---

[7] Exhibit 8 is a true and correct copy of the June 14, 2019 ACDV form with redactions per Fed. R. Civ. P. 5.2.
[8] Attached as Exhibit 9 to this response.



## Attridge's Third Dispute

18. Four months later, in a dispute response dated October 15, 2019, Colonial again responded without a removal value in the CII indicator[9]. This ACDV contains the same certification of verification. Predictably, following this response Attridge's report continued to reflect that her mortgage was included in a Chapter 7 bankruptcy when it was not.

| Account Type | Interest Type | Port. Type | Term Dur. | Freq. | Date of Account Information | Date Closed | Date of Last Payment | Sch. Payment | ECOA | CII | FCRA DOFD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 26 | | M | | | 07-31-2015 | 07-31-2015 | | | 1 | E | 07-31-2015 |
| 26 | F | M | 360 | M | 09-30-2019 | | 09-21-2019 | | 1 | | |

19. Again, the failure to put a removal value had the effect of verifying its false reporting as accurate. TransUnion's October 2019 dispute response shows that Colonial verified the bankruptcy reporting as accurate[10]:

---

[9] Exhibit 10 is a true and correct copy of the October 15, 2019 ACDV form with redactions per Fed. R. Civ. P. 5.2.
[10] Exhibit 11 contains a true and correct copy of the dispute response with redactions per Fed. R. Civ. P. 5.2.



## Plaintiff's Objection to Colonial's Expert

20. Dean Binder, Colonial's credit reporting expert has a long career as an expert witness. Here he makes a number of statements that are legal conclusions, made without the support of evidence, or are pure speculation.

*Legal Conclusion*

21. First, Binder offers a legal conclusion in the guise of an expert opinion. He states that failing to use the "Q" code does not constitute an FCRA violation. This and other statements in his declaration are conclusions of law. An expert's legal opinion is inadmissible. Particularly when, as shown above, its not difficult to comprehend what happened here.

> "Rule 704, however, does not open the door to all opinions. The Advisory Committee notes make it clear that questions which would merely allow the witness to tell the jury what result to reach are not permitted. Nor is the

> rule intended to allow a witness to give legal conclusions."
> *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983)
> "An expert's legal opinions are inadmissible."
> *Olson v. City of Burnet*, No. A-20-CV-00162-JRN, 2021 U.S. Dist. LEXIS 69851, at *7 (W.D. Tex. 2021) (citing *Owen*)

22. Legal conclusions are familiar territory to Binder:

    > "The Court agrees that much of Binder's declaration consists of conclusory statements that go directly to legal issues at the heart of this summary judgment dispute."
    > *Sung Gon Kang v. Credit Bureau Connection, Inc.*, No. 1:18-CV-01359-AWI-SKO, 2021 U.S. Dist. LEXIS 41108, at *15 (E.D. Cal. 2021).

*Lack of Foundation, Speculation, Reliability*

23. Further, Binder's claims are unsupported by the evidence. He did not review any evidence to support his testimony that the other bureaus changed their reporting in response to Colonials updated reporting. Under "Documents Reviewed for this Matter" he includes portions of TransUnion's production, two pages of Colonial's production, and credit reporting from Colonial directed at TransUnion.

24. Plaintiff objects that the statement, "The same type of correction was successful with CRA's[sic] Equifax and Experian as Defendant reports the exacts[sic] same information to all 3 CRA's[sic]." Nowhere does he identify what documents he alleges contain information about any other bureaus. Plaintiff objects that Binder lacks an evidentiary foundation and he based his opinion on speculation.

25. He cannot testify as to Experian and Equifax's actions as he has not reviewed any documents concerning them. Worse yet, Binder testifies inconsistently with Colonial's discovery requests. In response to requests for admission Colonial only admits to furnishing data to TransUnion. See responses to requests for admission 2 and 3 in Exhibit 12. In response an interrogatory requesting the identity of every entity who received the disputed information Colonial identifies eight pages of documents AMA 189-194 and AMA 220-221. See interrogatory 4 in Exhibit 13. These documents are the ACDV forms sent to TransUnion. AMA 189-190 is the May 14, 2019 ACDV attached referenced above as Exhibit 7. AMA 191-194 are two copies of the same two-page ACDVs, AMA 193-194 is referenced above as Exhibit 8. AMA 191-192 are duplicates of AMA 193-194 and are redacted and attached as Exhibit 14. AMA 220-221 are the October 15, 2019 ACDV attached above as Exhibit 10. All of these are communications to TransUnion.

26. The incorrect reporting didn't appear at any other bureau because Colonial furnished the information only to TransUnion. Plaintiff objects that Binder's testimony is unreliable.

*Wrong Manual*

27. Finally, Plaintiff objects that Binder's opinions are based on the 2019 CRRG manual. Colonial provided the 2017 CRRG in response to discovery requests and attached the 2017 CRRG to its motion. Nowhere does Binder explain the

differences between these two documents or why he is referring to a different manual than the one used by Colonial.

## Colonial's Expert

28. Subject to the above objections: Binder chants Colonial was "devoted to the process of the correction." That devotion is not borne out by Colonial's reporting. It knew the reporting was inaccurate and continued to repeat it. The FCRA prohibits this:

    > ```
    > "A person shall not furnish any information
    > relating to a consumer to any consumer reporting
    > agency if the person knows or has reasonable cause
    > to believe that the information is inaccurate." 15
    > U.S.C. 1681s-2(a).
    > ```

29. Colonial's expert can spew endless technical jargon at the Court, but proof is in the ends—information furnished, not in the means—how it was furnished. Whether accomplished by dropping the correct letter into the correct box, sending the correct form to the correct address, or signaling the correct set of dots and dashes in Morse code—what matters is that the information furnished is accurate—not the method of furnishing that information.

30. Here, after three disputes, handled by two different credit reporting specialists—who had the manual within reach—Colonial's failure to understand credit

reporting tools and adhere to standards caused it to furnish information that it knew was inaccurate and a violation of the FCRA.

Negligence and Willfulness

31. Colonial furnished inaccurate information to TransUnion under the certification of the verification of accuracy. Attridge repeatedly disputed it. Colonial incorrectly verified the false information. Colonial acted with negligence in handling Attridge's disputes. It disregarded the manual that was within arm's reach. The very manual which states—in plain language—what will and will not correct the false reporting. Otherwise it would not have repeatedly verified inaccurate information. Not only is this negligence, it rises to the level of willfulness.

> "Only defendants who engaged in 'willful misrepresentations or concealments' have committed a willful violation and are subject to punitive damages under § 1681n."
> *Cousin v. Trans Union Corp.*, 246 F.3d 359, 374 (5th Cir. 2001)
> "For the violation to be "willful," thereby justifying an award of punitive damages under the Fair Credit Reporting Act, a defendant's course of conduct must exhibit a "conscious disregard" for or entail "deliberate and purposeful" actions taken against a plaintiff's rights."
> *Sapia v. Regency Motors of Metairie, Inc.*, 276 F.3d 747, 753 (5th Cir. 2002)
> "Rather, reckless disregard of an FCRA requirement is enough to qualify as a willful violation under § 1681n. Safeco, 551 U.S. at 71."
> *Lowry v. Croft (In re Croft)*, 500 B.R. 823, 846-47 (Bankr. W.D. Tex. 2013)

32. Colonial acted with conscious disregard to Attridge. Colonial hired and trained

credit reporting specialists. Each with the credit reporting manual on their desk. The manual contained warnings about understanding the tools for and maintaining the standards for credit reporting.[11] It contained the codes they needed and the instructions on how to use them to remove the inaccurate reporting. Each specialist reviewed and signed off on each response they submitted. After each dispute they continued to cling to an approach they knew would not reflect accurate reporting. The only explanation is that they disregarded their training and manuals. This is sufficient for a jury to find that Colonial acted willfully.

Damages

33. Colonial asserts that Attridge did not suffer damages as a result of the false bankruptcy reporting. Its expert, in other litigation, has testified to the damaging nature of bankruptcy reporting:

> "An account included in bankruptcy is considered a **major derogatory** by FICO."
> *In re Anzaldo*, 612 B.R. 205, 212 (Bankr. S.D. Cal. 2020) (emphasis added).

34. Attridge's career includes 23 years at Security Service Federal Credit Union with the last 11 as a senior mortgage loan officer. She has since worked in the mortgage industry. She takes pride in being well organized, a good manager of her finances, and a hard worker. She understands credit reporting, how it affects people, and

---

[11] See Exhibit 2.

how inaccurate information should be corrected.[12]

35. Colonial claims that she needs corroborating testimony to support an award of damages. Colonial deposed three witnesses that testified about Attridge's mental anguish and emotional distress. Her sister testified about the toll the negative reporting has taken on her. See Exhibit 15. Her brother, an Austin police officer, testified that she was put on edge, hair trigger, and emotional because of this. See Exhibit 16. Her husband testified that from the time she learned of the false bankruptcy she has undergone a "marked character change." See Exhibit 17.

36. Colonial ignored the evidence that it obtained in alleging that there is no corroborating evidence of her mental anguish.

37. Attridge details her mental anguish in her declaration attached as Exhibit 1. She details the saga of disputing the bankruptcy, her training, and the time and money spent disputing these items. She testifies as to how her employer and co-workers saw the false information and how that affected her. She estimates that she spent $200 and 40 hours in drafting disputed and mailing them. She values her time at $31 per hour for damages of $1,240. See Exhibit 18.

---

[12] See generally Exhibit 1.

The Summary Judgment Standard

38. Rule 56 provides that a party is entitled to a summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

39. Plaintiff has shown via the 2017 CRRG, deposition testimony, credit reporting documents, and Attridge's declaration that there is a genuine dispute as to material facts. Colonial is not entitled to a judgment as a matter of law.

40. Attridge provides evidence to show:

    a. Colonial furnished information it knew to be inaccurate;

    b. Her credit report reflected that inaccurate information;

    c. She disputed the inaccurate information;

    d. Colonial received the disputes;

    e. Colonial failed to correct its reporting;

    f. The inaccurate reporting was published to third parties; and

    g. Attridge suffered damages.

41. In evaluating summary judgment evidence, the Fifth Circuit holds that the Court must refrain from making credibility determinations or weighing the evidence.

> "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility

determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## Conclusion

42. Colonial furnished information that it knew was false—that Ann Attridge's mortgage had been included in a Chapter 7 bankruptcy. As soon as Attridge discovered this she disputed it. Colonial certified that it had verified information it knew to be false. Attridge re-disputed. Colonial again certified it had verified it. She disputed it a third time. Colonial again certified the verification the false information. False information that was published to Attridge's employer and co-workers.

43. Colonial and its expert blame TransUnion. TransUnion followed credit reporting standards and reported exactly what Colonial furnished. Colonial's expert misdirects on this point. He claims that other bureaus, who were never furnished the incorrect information, corrected it. He chants that Colonial was "devoted" to correcting it.

44. But not devoted enough to refer to the manuals within arm's reach of its credit reporting specialists. Manuals showing that leaving the CII field blank is ineffective at removing the incorrect reporting. Reporting that shows a sophisticated consumer who works in mortgage underwriting has a mortgage that was included in a bankruptcy. False bankruptcy information that caused her mental angish.

45. Plaintiff asks the Court to deny Defendant's motion for summary judgment.

Dated: July 23, 2021

Respectfully Submitted,

/s/William M. Clanton
William M. Clanton
Texas Bar No. 24049436

Law Office of Bill Clanton, P.C.
926 Chulie Dr.
San Antonio, Texas 78216
210 226 0800
210 338 8660 fax
bill@clantonlawoffice.com